UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEITH RAYNELL JONES                                      CIVIL ACTION

VERSUS                                                  NO. 07-3057

SHERIFF HARRY LEE ET AL.                                 SECTION "K" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Keith Raynell Jones, is a prisoner currently incarcerated in the Jefferson Parish Correctional Center ("JPCC") in Gretna, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Jefferson Parish Sheriff Harry Lee, JPCC Warden Sue Ellen Penouilh, the sheriff's "Special Investigation Unit," JPCC inmate, Travis Freeman, and the Jefferson Parish Correctional Center.  Jones alleges that while incarcerated in the JPCC in March and April 2007, he was attacked, stabbed and injured by defendant Freeman, another inmate with whom he was being housed.  He seeks monetary and injunctive relief.  Record Doc. No. 1 (Complaint at ¶ V).

On August 23, 2007, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Brad Theard, counsel for defendants.  Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.[1]

---

[1]By letter dated September 10, 2007, plaintiff submitted to the court a statement from his wife concerning the criminal charges pending against him, which the court has considered. However, its content is largely irrelevant to the court's screening process in the instant case.

## THE RECORD

Jones testified that he is currently incarcerated in JPCC on second degree murder, weapons and drug charges for which he has not yet been tried. He stated that he was arrested on these charges on May 13, 2006, and he has been held in JPCC on those charges since that time.

He confirmed that the claims he asserts in this case are based on two separate incidents in which he was stabbed on each occasion in the jail by another inmate, defendant Travis Freeman.  Jones testified that the first stabbing occurred on March 19, 2007.  He testified that on the day before the stabbing, he was cleaning up the pod on which he was housed because it was his job to do so every day and every night as the inmate in charge of the pod.  He stated that as part of his job at night while cleaning up, he would take a vote among the inmates on the pod concerning what channel they should watch on the television set.  He said whatever the majority wanted would be the channel he put on the television set.

Jones testified that on the night of the first incident, Freeman disagreed with the television channel that was selected, so Freeman began to blurt out obscenities, which Jones said he ignored. He stated that on the next morning the inmates woke for breakfast, and while Jones was standing in front of the television, Freeman approached him in view of the deputy on duty, Jay Colzy, and Freeman "stabbed me several times in my back and

in my arm." Jones said he ran around the table away from Freeman, while shouting to Deputy Colzy that Freeman was stabbing him. Jones said another deputy, Sgt. Pierre, arrived about that time and asked what happened, "and I was immediately taken to medical for my sustained injuries."

Jones explained that he was housed at that time in the same prison dorm as Freeman.  He described the area where they were housed as a "lockdown tier," a grouping of 13 cells that opened into a common area or "dayroom."  He stated that he and Freeman were not cellmates: Jones was housed in Cell No. 2, while Freeman was housed in Cell No, 6 at that time. He stated that the television set was in the common area or "dayroom" on the tier.  He said that the inmates on the tier were permitted out of their cells into the dayroom area in the morning and again after lunch until bedtime.

Jones testified that he had not had any problems with Freeman before this first stabbing incident.  He stated that Freeman, like him, was a pretrial detainee incarcerated on an attempted murder charge.

Jones testified that Freeman chased and stabbed him for about fifteen to twenty seconds before Jones got away from him. He stated that Deputy Colzy saw what was happening and apparently summoned Sgt. Pierre.  He said Freeman stopped stabbing him because Jones was screaming to the deputy, retreated into the back of the dormitory where the shower is located and "flushed the weapon."  Jones testified that Deputy Colzy

3

and Sgt. Pierre entered the dayroom about ten or fifteen minutes after the stabbing incident and escorted Jones to the medical unit where injured or sick inmates are taken for treatment.

Jones said he suffered three stab wounds to the back and one in his left arm in the first stabbing incident.  Jones said he believed his injuries required stitches, but instead he was only given bandage strips.  He said Freeman had stabbed him with an ice pick, not a blade, resulting in puncture wounds.

In the first attack, Jones said Freeman "just jumped me, he just did it," without any threat or warning. "I didn't know that we were going to have any altercation. . . . I didn't know anything. I was totally blind to what he had on his mind," he said.  Plaintiff testified that he does not know what happened to Freeman after Jones was taken to the medical unit.  Jones said he was given a tetanus shot in the medical unit after this first incident.

Jones testified that after the initial stabbing incident he was returned from the medical unit that same day, March 19th, to the tier on the fourth floor where he had been housed, allowed to get his belongings, and then he was moved to another pod on the third floor.  He stated that when he returned to get his belongings, Freeman was not on the tier but was being held in "the holding tank" on the second floor, where inmates are kept pending disciplinary actions against them.  He said that, in light of the nature of the

4

incident, "that's where he [Freeman] was put in order to be out of my way in case he was a threat to security."  Thus, Jones acknowledged that initially Freeman was separated from him by sheriff's deputies for security reasons.

Jones testified that he was taken to a disciplinary proceeding against Freeman concerning the first incident, at which time, "because I was the victim, I didn't receive any disciplinary action." He said that because Freeman had been the aggressor in the first incident, Freeman was "given a certain amount of days on lockdown" as punishment, perhaps two or three weeks. Jones said that during that time "me and one of the deputies over here at the jail got into a verbal dispute about something, and the deputy wrote me up, and when I went to disciplinary for this writeup, I received . . . seven days lockdown for the verbal dispute me and the deputy had" on or about April 11th. He identified this deputy as Deputy Hammond.

As to the second stabbing incident, Jones stated that when he was brought onto the lockdown tier, Freeman was still there, though they were in different cells, Jones in Cell No. 1 and Freeman in Cell No. 11.  He stated, however, that "we weren't supposed to be on the same side because of the altercation we had prior to this." By "same side," he said that some of the cells on the lockdown tier were in a row on the left side of a common hallway and some were on the right side of a common hallway, and he and Freeman were both housed in separate lockdown cells on the left side.  He said this is important because

a door separates the two sides of the hallway and that because of the layout and the restrictions on when inmates in lockdown were permitted out of their cells, there is no way inmates housed on one side can have any physical contact with inmates kept on the other side.  He said a deputy's booth was located in the middle of the lockdown area hallway, so that the deputy on duty could monitor inmates on both sides of the lockdown tier.

Jones said that while on lockdown, each inmate is allotted only one hour outside his cell at a time. For example, he said, when it was his turn to have an hour outside his cell, Cell No. 1 would be opened into the hallway so that only he and his cellmate could be outside the cell, and they would return into their cell before Cell No. 2 would be opened and those inmates could come out while the others were returned to their own cells.

Jones said the second stabbing incident in which Freeman again attacked him occurred on April 11th, the first day Jones himself had been moved onto the lockdown pod. He described the incident as follows: "I got moved on the [lockdown] pod maybe about 1:30, right during the shift change period. . . .  I was on the pod for maybe about an hour . . . I didn't know he [Freeman] was on the pod because he had never showed his face. . . . and when I went on the pod I fell asleep at first. . . . When I woke up and I seen him at the bars, I said 'who is that in Cell 11?'  He was like, 'you know who this is and

6

you know what's going to happen . . . . At the same time he's threatening me, Sgt. Sullivan is coming to sign the books. I was screaming for Sgt. Sullivan's attention. When she gives me her attention, I tell her that I'm not supposed to be on this side with this guy [Freeman] because we had an altercation already. Before she could even answer or adhere to what I'm saying or give any thought to it, she just blurted out something like, 'all right, I'll be back to talk to you,' or something like that and she left off the tier. So now, . . . I know that it's not a reason for this cell that I'm in to open. . . . I told Sgt. Sullivan what was going on and she just left off the tier anyway."

Jones stated that Freeman continued to threaten him while the two were inside their separate cells. Jones said, "On the lockdown tier, . . . there's no way that he can touch me because when he's out there, there's nobody else out there with him." Eventually, it became Freeman's turn to be let out of his cell for an hour.  Jones said, "After his [Freeman's] hour was up, he went back into his cell. . . It's toilet paper . . . that you can put in between the locking mechanism to the cell. If you put some wet toilet paper in between there, when the deputy thinks your cell is locked, it actually isn't, and you can just pull your cell open and you can come out of your cell." Jones said that Freeman put wet toilet paper in the locking mechanism of his cell when his hour outside the cell was up "so that when the cell gate closes it doesn't lock; he can just open it back up like an unlocked door."

Jones acknowledged that Freeman's meddling with the locking mechanism on his cell door was something Freeman was not supposed to do.  Asked if the deputy on duty in the security booth saw Freeman put the toilet paper in the lock, Jones said, "No, obviously the deputy didn't see him put the toilet paper there because if the deputy would have seen that, I don't believe that the deputy would have allowed him to do it." Jones identified the deputy on duty at that time as Deputy T. Esserman.

Asked how he knew that Freeman had rigged his cell door to open by stuffing toilet paper into the locking mechanism, he said, "I don't actually know that he did this, but this is the only way – after I asked around . . . – that he could open his cell the way he did." Jones said he could not say if the deputy had seen Freeman rig the door with toilet paper or knew that it had happened.

Jones testified that Freeman freed himself from his cell, and Jones heard the noise from where Jones was in his own cell, playing chess with his cellmate. Jones stated that his own cell door was closed, but when Freeman came to Jones's cell, Freeman pulled on the cell door and it opened, "and the next thing I know I was getting stabbed in my neck, he was in my cell, he was stabbing me in my neck." Jones said he fought his way out of the cell on to the floor in the hallway, where he and Freeman were "tussling" for the ice pick or whatever instrument Freeman was using to stab him.

Asked why his own cell door was open so that Freeman could enter, Jones said, "My cell door was not supposed to be open. He pulled my cell door open the same way that he pulled his open. What I'm saying is the guy that was in my cell before me – before I came on the lockdown tier – . . . he must have did something to the cell to where it could be opened the same way that Travis Freeman opened his."

Jones said the second stabbing incident lasted maybe 30 to 45 seconds.  He said the altercation broke up when Deputy Esserman told both of them to "lockdown," called for security on the phone and ten other deputies arrived within about five minutes.  Jones said before the deputies arrived, the two inmates had separated from each other, and Freeman returned to his cell where he tried to flush the weapon he had used to stab Jones down the toilet.  Jones testified that when the deputies arrived to take Jones off the pod, they found the weapon.

Jones testified that the deputies brought him to the medical unit immediately and moved Freeman to "the other side" of the lockdown tier, leaving Jones on the opposite side, "which is where we were supposed to be separated in the beginning."  He alleged that he and Freeman should have been kept separate in lockdown because there was a record that he and Freeman had been in an altercation and inmates in the jail are not supposed to be kept around "known enemies . . . because that is what classification does." He said he knows that inmates are supposed to be separated in the jail from "a known

enemy" based on "the rule book" and what deputies have told him. Asked if he knew why he had been put in Cell No. 1 on the lockdown tier while Freeman was put in Cell No. 11 if the rule book says that is not supposed to happen, he said, "your guess is as good as mine."

Jones noted that the two stabbing incidents occurred less than a month apart, and alleged that sheriff's deputies should have known that the two inmates should not have been housed so closely together in this fashion in lockdown.

Asked what injuries he suffered in the second stabbing incident, Jones testified that he was stabbed twice in the neck and twice in the face and two or three times in his left arm. He stated that he received the same treatment as he had received the first time, "bandage stitches" which were changed a few times. He alleged that he needed stitches, but was told by medical personnel at the jail that he did not need stitches.

Jones clarified that his claim against the sheriff's personnel is that they should have taken steps to protect him against Freeman, but failed to do so. He confirmed that his claim against Freeman is that Freeman was the attacker. He stated that Freeman and Jones both remain in the JPCC, but they are currently separated from each other. He added that in the second incident Freeman had further injured him by exacerbating a previous leg injury by kicking him in the leg.

ANALYSIS

I.      STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action

is frivolous or malicious.'"  Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994)

(quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as

amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact."  Davis

v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th

Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on

an indisputably meritless legal theory, but also the unusual power to pierce the veil of the

complaint's factual allegations and dismiss those claims whose factual contentions are

clearly baseless.'"  Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th

Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of

a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal

basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the

plaintiff an opportunity to verbalize his complaints, in a manner of communication more

comfortable to many prisoners."  Davis, 157 F.3d at 1005. The information elicited at

such an evidentiary hearing is in the nature of an amended complaint or a more definite

statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir.

1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing."  Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."  Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest

which clearly does not exist.'"  <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)).  "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not."  <u>Moore</u>, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[2]

## II.    <u>FAILURE TO PROTECT FROM HARM</u>

While the incidents described by Jones are truly unfortunate and possibly actionable as state law tort claims, the question for this court is not whether the stabbing incidents in which Jones was injured by another inmate were unfortunate or constituted state law violations, but whether a violation of federal constitutional rights has been

---

[2]Pro se civil rights complaints must be broadly construed, <u>Moore</u>, 30 F.3d at 620, and I have broadly construed the complaint in this case.

stated.  Accepting as true for present purposes all of Jones's written submissions and testimony, I must conclude that no violation of Jones's constitutional rights by the defendants occurred in these circumstances.

As previously noted, Jones was a pretrial detainee at the time of the incident on which he bases this claim.  In Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), however, the Fifth Circuit held "that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." Id. at 650. Thus, regardless whether the inmate is a pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail officials that expose an inmate to being harmed by another inmate, such as those alleged by Jones in this case.  Hamilton v. Lyons, 74 F.3d 99, 104 n.3 (5th Cir. 1996); Hare, 74 F.3d at 650.  Here, although plaintiff alleges that he was exposed to harm by prison officials' acts or omissions, he fails to state a claim cognizable under Section 1983.

Under the Eighth Amendment, prison officials have a duty to protect inmates from violence by other inmates and to take reasonable measures to protect their safety.  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hare, 74 F.3d at 650.  The Eighth Amendment standard enunciated in Farmer applies to a prisoner's claim that prison officials failed to

protect him from harm inflicted by other inmates.  Thus, prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.  Farmer, 511 U.S. at 834; Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998).

Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitute conduct proscribed by the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976).  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer, 511 U.S. at 847.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837; accord Newton, 133 F.3d at 308.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Board of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (additional citations and footnote omitted) (emphasis added).  "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  Norton, 122 F.3d at 291.

In this case, it cannot be concluded that prison officials unconstitutionally exposed plaintiff to a substantial risk of serious harm because his own testimony confirms that prison officials had no reason to believe or even suspect that the inmate who allegedly attacked him posed danger to Jones under these particular circumstances.  Before the first stabbing, there was no history known to defendants of prior incidents between Jones and Freeman.  The first incident occurred suddenly and without warning.  As Jones testified,

prison officials had no reason to suspect that the inmate who attacked him posed any known or anticipated threat to him before the first assault.

Even as to the second stabbing, it cannot be concluded that defendants acted with deliberate indifference to a threat of serious harm to Jones.  Although the prior stabbing incident was known to prison officials, the layout of the lockdown tier and the security precautions in place against inmates housed in lockdown coming into contact with each other, all as fully described by Jones in his testimony, were reasonable.  They were measures upon which prison officials could reasonably expect that Jones and Freeman would remain separated and would not come in contact with each other, even in lockdown.  The security measures in lockdown in fact would have been sufficient to protect Jones from harm, except for the clandestine and nefarious conduct of Freeman and perhaps other inmates in rigging the cell door locks with wet toilet paper so that they could be opened, all in a fashion obviously unknown to the guards and prison officials.  Thus, it was the inmates themselves who created the risk of harm, despite the efforts of jail officials to avoid it, and it cannot be concluded that any defendant or other JPCC guard knew or had reason to know that the cell doors would be rigged by the inmates in such a way as to thwart their security measures.  There is no basis on which defendants could actually have drawn the inference that Freeman would manipulate his cell lock -- and that Jones's cell lock would also have been simultaneously manipulated by a previous

17

occupant -- to permit the two antagonists again to come in contact with each other in the high security lockdown area.

Under these circumstances, it cannot be concluded that any act or omission of prison officials knowingly exposed Jones to a substantial risk of serious harm.  Any conceivable claim that prison officials violated his constitutional rights by failing to protect him from harm in these peculiar circumstances must be dismissed.

III.   <u>FREEMAN NOT A STATE ACTOR</u>

To be successful under Section 1983, a plaintiff must establish that the defendant has acted under color of state law in violating his rights.  <u>Daniels v. Williams</u>, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).  Action taken under color of state law for purposes of Section 1983 requires a defendant's use of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law" and when the defendant is engaged in the "performance of official duties." <u>United States v. Causey</u>, 185 F.3d 407, 415 (5th Cir. 1999).  To state a claim under Section 1983, a plaintiff must show "(1) deprivation of a right, privilege or immunity secured by the federal laws or Constitution (2) <u>by</u> <u>one</u> <u>acting</u> <u>under</u> <u>color</u> <u>of state</u> <u>law</u>." <u>Mississippi Women's Medical Clinic v. McMillan</u>, 866 F.2d 788, 791 (5th Cir. 1989) (emphasis added); <u>Morris v. Dearborne</u>, 181 F.3d 657, 666 n.6 (5th Cir. 1999).  Plaintiff

must show that defendant's actions are "fairly attributable to the state."  <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988).

Under no circumstances can Travis Freeman, the inmate named by plaintiff as a defendant in this matter, be considered a state actor.  <u>See</u> <u>Polk County v. Dodson</u>, 454 U.S. 312, 325 (1981); <u>Hudson v. Hughes</u>, 98 F.3d 868, 873 (5th Cir. 1996); <u>Mills v. Criminal District Court No. 3</u>, 837 F.2d 677, 679 (5th Cir. 1988).  Freeman's actions upon which plaintiff bases his claims were clearly taken as a private person not in any official capacity authorized by the State.  Because Freeman is not a state actor, plaintiff's Section 1983 claim against this defendant has no basis in federal law and must be dismissed for failure to state a cognizable claim.

## IV.   <u>STATE LAW CLAIMS</u>

At most, Jones's allegations are state law tort claims, against the sheriff's personnel defendants for possible negligence and against Freeman for battery.  In the absence of a federal constitutional violation, however, this court lacks subject matter jurisdiction over such state law claims.

Any state law claims asserted by plaintiff are not within this court's supplemental subject matter jurisdiction in the absence of a cognizable federal claim. If my recommendation to dismiss plaintiff's Section 1983 claims is accepted by the presiding

district judge, plaintiff will have no federal claims remaining in this action, and the court will have no supplemental jurisdiction over his state law claims.  28 U.S.C. § 1367(a).

A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3).  The "general rule" in the Fifth Circuit "is to decline to exercise jurisdiction over pendent state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial."  Batiste v. Island Records, Inc., 179 F.3d 217, 227 (5th Cir. 1999) (citation omitted); accord Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims"); Yetiv v. Hall, 132 Fed. Appx. 1, 2005 WL 19500, at *3 (5th Cir. 2005); Smith v. Amedisys Inc., 298 F.3d 434, 447 (5th Cir. 2002).

In the instant case, no trial date has been set and the parties have not yet commenced discovery.  These proceedings remain at the earliest screening stage for pro se and in forma pauperis complaints.  If plaintiff's Section 1983 claims are dismissed as recommended above, no possible basis for federal subject matter jurisdiction will then be apparent from the face of this complaint.  Accordingly, pursuant to Section 1367(c) and having balanced the relevant factors of judicial economy, convenience, fairness and

20

comity, the court should decline to exercise jurisdiction over Jones's state law claims and dismiss them without prejudice for all purposes contemplated by 28 U.S.C. § 1367(d). Yetiv, 2005 WL 19500, at *3; Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 587 (5th Cir. 1992); Newport Ltd. v. Sears, Roebuck & Co., 941 F.2d 302, 307 (5th Cir. 1991).

## **RECOMMENDATION**

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's Section 1983 complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

**IT IS FURTHER RECOMMENDED** that plaintiff's state law tort claims be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c) so that he may pursue them in state court if he desires to do so.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __24th__ day of September, 2007.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE